# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

EDUARDO JACOBS,

                Plaintiff,               CASE NO. 15-10516
                                     HON. DENISE PAGE HOOD

v.

RAYMON ALAM,
DAMON KIMBROUGH,
MICHAEL KNOX,
DAVE WEINMAN,

                Defendants.

_____/

## ORDER REGARDING VARIOUS MOTIONS FOR SUMMARY JUDGMENT [#80; #83; #84; #86]

## I.      BACKGROUND

On February 9, 2015, Plaintiff Eduardo Jacobs ("Jacobs") filed this action against Defendants Ramon Alam ("Alam"), Damon Kimbrough ("Kimbrough"), Michael Knox ("Knox"), and David Weinman ("Weinman"). (Doc # 1) On July 27, 2015, Jacobs filed a First Amended Complaint alleging two counts: *Bivens* Claim (Count I); and Violation of Civil Rights pursuant to 42 U.S.C. § 1983 (Count II). (Doc # 25) On November 13, 2015, this Court entered an Order Granting Defendants' Motion for Summary Judgment on Count II, and dismissed Count II of the First Amended Complaint. (Doc # 37) This matter is presently before the Court

on cross motions for summary judgment on the remaining *Bivens* Claim (Count I). (Doc # 80; Doc # 83; Doc # 84; Doc # 86)  The four motions have been briefed.

On January 3, 2014, Detroit Police Officers Kimbrough and Knox, along with Wayne County Deputy Sheriffs Alam and Weinman, were executing a federal immigration warrant for Reyes Vargas at a house located at 5837 Christiancy in Detroit, Michigan.  They were doing so as part of the Detroit Fugitive Apprehension Team, a law enforcement agency comprised of federal, state, and local law enforcement agents from southeast Michigan.  Present at the house were Javier Vargas, Sr. ("Vargas, Sr."), Reyes Vargas's brother, as well as Javier Vargas, Jr. ("Vargas, Jr.") and his friend Michelle Dotson ("Dotson").  Vargas, Sr. was the tenant of the main floor and second floor of the house.  Plaintiff Jacobs was the tenant of the basement level of the house, and he was not at the house when Defendants arrived.

Defendants all arrived at the house in separate, unmarked vehicles, and they all approached the door.  They were in plain clothes, and the parties dispute whether Defendants were displaying their badges on their chests and/or their duty belts.  It was nighttime and dark outside.  Vargas, Sr. answered the door and consented to Defendants' entry and search of at least the main floor and second floor of the single house dwelling.  The parties dispute whether Vargas, Sr. informed Defendants at that time that he could not consent to a search of the basement, as that was Jacobs's

unit.  However, it is undisputed that Kimbrough and Knox performed a sweep of the entire house, including the basement.  Kimbrough testified that they were looking for Reyes Vargas and ensuring the house was free of any potential threat.  The parties dispute whether Defendants "ransacked" the basement or moved any items.

While Kimbrough and Knox swept the house, Alam began interviewing Vargas, Sr., Vargas, Jr., and Dotson in the dining room.  Kimbrough and Knox joined Alam in the dining room after they cleared the house.  After a while, Knox and Vargas, Sr. left the house.  Vargas, Sr., Knox, and Weinman went to look for Reyes Vargas around the neighborhood.  Kimbrough and Alam remained inside the house interviewing Vargas, Jr. and Dotson.

Later that night, Jacobs arrived at the house.  He had a concealed pistol license and a loaded weapon, a Glock 9-millimeter, on his person.  At this time, Knox was outside the house, inside his vehicle.  Weinman was outside the house, inside his own vehicle, interviewing Vargas, Sr.  Weinman saw Jacobs pull up to the house in his truck.  Vargas, Sr. told Weinman that Jacobs lived in the basement.  (Doc # 83-7, Pg ID 755)  Weinman alerted Kimbrough and Alam—who were still inside the house with Vargas, Jr. and Dotson—via radio that another person who lived in the basement, per Vargas, Sr., was possibly going to enter the house.  *Id.* at 757. Kimbrough went to the front door of the house to wait for Jacobs.  Jacobs, however, entered the house through a rear entry which went directly into the basement level.

Shortly thereafter, it is undisputed that Jacobs rapidly ascended the stairs from the basement and into the kitchen while shouting (something to the effect of, "Who the fuck went into my house?!") and forcefully opening the door into the kitchen on the main floor of the house. Kimbrough was sitting at the dining room table and was closest to the kitchen. Vargas, Jr. and Dotson were in the dining room. Alam was pacing back and forth between the dining room and living room area. Upon hearing the bang of the door, Kimbrough, Vargas, Jr., and Dotson all jumped up. Within seconds, shots were fired. Many of the details surrounding the shooting are disputed and testimony at the various criminal proceedings and depositions is at times conflicting.

Jacobs testified at his deposition that he walked up the stairs with his gun at his side in its holster, but that he did not have his hand on his gun. (Doc # 84-6, Pg ID 1308-09) He testified consistently at the criminal trial. (Doc # 84-4, Pg ID 1171-72) Jacobs stated that he was excited, wanted to find out who went into his property, and went up the stairs shouting, "Who the fuck went into my house?!" *Id.* Jacobs testified that as he opened the door into the kitchen, he saw an "eight-foot black man" who "was not supposed to be there." (Doc # 84-6, Pg ID 1309) Jacobs testified that he immediately turned around, reached for his weapon but was never able to unholster it, and fell down the steps. *Id.*; Doc # 84-4, Pg ID 1175, 1193-94, 1214, 1223. He never entered the dining room or kitchen. (Doc # 84-4, Pg ID 1174, 1177)

Jacobs testified that someone started shooting him as soon as he turned his back, and that he slid down the stairs as he was being shot at. *Id.* at 1178; Doc # 84-6, 1310. Jacobs testified that no one ever identified themselves as Detroit Police or told him to drop his gun. (Doc # 84-4, Pg ID 1175) Jacobs testified that all he could see when he got to the top of the stairs was Kimbrough's face. *Id.* at 1194-95. He testified that he reached for his weapon to feel secure, but that Kimbrough had not threatened him—Jacobs just knew "he wasn't supposed to be there" because all of his neighbor's friends were Hispanic, not black. *Id.* at 1214-15.

At the preliminary examination, Kimbrough testified that he had his back to the kitchen when he heard the banging door, and that when he turned around to face the kitchen, Jacobs was pointing a gun to his face. (Doc # 86-2, Pg ID 1727) Kimbrough testified that he screamed to him to put the gun down two or three times, and that he identified himself as a police officer. *Id.* Jacobs did not comply and fired his gun at Kimbrough first. *Id.* Kimbrough then fired back a few rounds from where he was standing. He saw Jacobs advancing towards him, and Kimbrough ran into a nearby bedroom for cover. *Id.* at 1729. Kimbrough also stated that he saw a live 9-millimeter round on the floor of the kitchen, in the area where Jacobs had been standing. *Id.* at 1743. Kimbrough testified consistently at the criminal trial and at his deposition. (Doc # 84-3, Pg ID 933-35; Doc # 80-2, Pg ID 603-08) Kimbrough testified that he fired at least three shots through the wall of the bedroom to the area

at the top of the basement stairs where Jacobs had been standing, with the intention to kill Jacobs after Jacobs had shot at him two to three times and had ignored his commands to put the gun down. (Doc # 80-2, Pg ID 608)

At the preliminary examination, Alam testified that Jacobs came from the basement, swung the door open, and had a gun raised at eye level. (Doc # 86-2, Pg ID 1701) Alam further testified that Kimbrough said, "police, drop the weapon" before he heard any shots being fired. *Id.* at 1702. Alam testified that he then returned fire because he was in fear for his life, his partner's life, and the lives of the two witnesses who were in the house. *Id.* at 1703. Alam testified consistently at the criminal trial and deposition. (Doc # 84-3, Pg ID 1059; Doc # 86-3, Pg ID 1790-91) He testified that he could not see who pulled the trigger, and that it was possible that Kimbrough shot at Jacobs and that Jacobs never shot at Kimbrough. (Doc # 86-3, Pg ID 1791)

At the preliminary examination, Dotson testified that after she heard the bang of the door, the officers said, "Detroit Police," and she just started hearing gunshots. (Doc # 86-2, Pg ID 1761) She testified that the officers had their hands on their guns and said, "Detroit Police" before drawing their guns. *Id.* at 1767. She also testified that she could not actually see Jacobs holding or firing the gun. *Id.* at 1767-68, 1771. She testified consistently at the criminal trial. (Doc # 84-3, Pg ID 981) She also testified that she heard gunfire coming from the kitchen area, and that she heard the

person who came up to the kitchen from the basement start automatically shooting. *Id.* at 983, 991. Dotson testified that everything happened very quickly. *Id.* at 994.

At the preliminary examination, Vargas, Jr. testified that after he heard the bang of the door, he heard a shot that he thinks came from the kitchen. (Doc # 86-2, Pg ID 1777) He testified that he could not see Jacobs. *Id.* at 1779-80. He also testified that he thinks he heard two shots before he heard, "Detroit Police." *Id.* at 1781. Vargas, Jr. testified consistently at the criminal trial. (Doc # 86-7, Pg ID 1882-83)

At the preliminary examination, there was additional testimony from Sergeant Joe Abdella ("Abdella"), an officer who was dispatched to the house to investigate the shooting. Abdella has since passed away. Abdella testified that he spoke with Jacobs at the Detroit Detention Center on the night of the shooting. (Doc # 86-2, Pg ID 1746) Abdella attempted to explain to Jacobs his constitutional rights several times, but Jacobs kept making unsolicited statements. *Id.* at 1747. Abdella testified that Jacobs told him that he could have shot the officer, that he had the jump on him, that he had his gun right on the officer, but that he did not pull the trigger when he had the opportunity to because he thought he recognized one of the people in the room. *Id.* at 1748. Abdella testified consistently at the criminal trial. (Doc # 84-3, Pg ID 1081-82)

While shots were being fired, Vargas, Jr. and Dotson ran toward the living room and the main door of the house. Alam pushed them toward the door and out of harm's way. After the shooting subsided, Kimbrough and Alam were on the main floor of the house, and Jacobs had gone back down to the basement. Kimbrough and Alam ordered Jacobs to place his gun on top of the washer/dryer in the basement and to come up the stairs with his hands up. Jacobs did as he was told, and Kimbrough handcuffed him while Alam provided cover. According to Kimbrough, Jacobs said, "You look like the motherfucker that robbed me last week." (Doc # 84-3, Pg ID 940) Weinman and Knox heard the shots from outside and approached the house, but by the time they entered the house, the shooting was over, and Jacobs was being handcuffed.

EMS subsequently transported Jacobs to Detroit Receiving Hospital. According to the medical records, Jacobs sustained a gunshot wound to the left arm "in the posterior superior aspect" with a retained bullet fragment. (Doc # 86-14, Pg ID 1988) He also sustained a small skin wound in his left lower abdomen that "appear[ed] to be another very superficial gunshot wound." *Id.* According to Jacobs, he spent about four hours at the hospital. (Doc # 84-6, Pg ID 1315) The medical records indicate that he was then discharged and released into police custody in stable condition. (Doc # 86-14, Pg ID 1988) According to a forensic laboratory

report, the bullet fragment removed from Jacobs's arm came from Kimbrough's weapon.  (Doc # 83-6, Pg ID 743)

Weinman testified at his deposition that, immediately after the shooting, he saw a live 9-millimeter round on the kitchen floor.  (Doc # 83-3, Pg ID 728)  He also went to the basement and cleared Jacobs's handgun for safety; there was a bullet in the chamber, and he placed the gun and the live round back on the washer/dryer.  *Id.* at 728-29.  At the criminal trial, Weinman had also testified that he went to the basement with another officer, took the weapon and removed the magazine from it, cleared the chamber, and placed the weapon back where it was on the washer/dryer. (Doc # 83-7, Pg ID 749)  He testified that he did this for officer safety.  *Id.* at 749-50.

Following the shooting, Detroit Police Department Officer Mary Gross ("Gross") investigated the scene.  According to her report, lighting at the scene was poor.  (Doc # 80-4, Pg ID 641)  Gross recovered seven 45-caliber shell casings from the living room floor (later determined to have been fired from Alam's gun), five 40-caliber shell casings from the bedroom floor (later determined to have been fired from Kimbrough's gun), one 9-millimeter live round from the kitchen floor, a Glock 9-millimeter blue steel semiautomatic handgun from on top of the dryer in the basement, a loaded magazine and a single live round next to the handgun on the dryer, another 9-millimeter magazine with unknown number of live rounds in the

living room of the basement unit, and two 30-caliber magazines loaded with unknown number of live rounds on top of the TV in the basement. *Id.* at 641-42.

There are questions of fact surrounding the live round found on the kitchen floor. According to Defendants, the live round was likely expelled from Jacobs's gun. Weinman testified at his deposition that if Jacobs had his weapon out and pulled the slide back to charge the weapon, not realizing that there was already a live round in the chamber, then that round would have been expelled from the handgun, landing in the kitchen, near the spot where Jacobs had been standing. (Doc # 83-3, Pg ID 732) During the criminal trial, Weinman testified consistently on this point. (Doc # 83-7, Pg ID 752) According to a forensic laboratory report, the 9-millimeter live round was identified as having been chambered in Jacobs's Glock 9-millimeter handgun. (Doc # 83-6, Pg ID 743) According to Jacobs, he never touched or racked his gun during the incident. (Doc # 84-4, Pg ID 1179)

It is undisputed that no physical evidence was found at the scene showing that Jacobs actually fired his weapon. Jacobs's weapon was recovered in the basement with what appeared to be ten rounds in the clip and a live round that had been cleared from the chamber. (Doc # 86-23, Pg ID 2092) At his deposition, Jacobs testified that his handgun had a ten-bullet magazine. (Doc # 84-6, Pg ID 1296) However, according to an Affidavit of Sergeant David L. Marshall, the photographs attached

to the affidavit are of Jacobs's weapon. (Doc # 94-4) The photographs plainly show a magazine that can hold seventeen rounds. *Id.* at 2538.

Following this incident, Jacobs was charged with four counts of Assault with Intent to Do Great Bodily Harm Less Than Murder, four counts of Assault with a Dangerous Weapon, two counts of Resisting and Obstructing a Police Officer, and one count of Felony Firearm. (Doc # 86-20, Pg ID 2082) On February 16, 2014, the 36th District Court in Detroit, Michigan held a preliminary examination at which Alam, Kimbrough, Abdella, Dotson, and Vargas, Jr. testified. (Doc # 86-2) The court found probable cause for Jacobs's arrest and prosecution and bound him over for trial. *Id.* at 1784-85. Jacobs was incarcerated at the Wayne County Jail from January 4, 2014 to February 20, 2014 when he was released pending the commencement of the criminal trial. (Doc # 86-21) Jacobs's trial took place October 20-23, 2014, and the jury returned a unanimous verdict of Not Guilty on each count. (Doc # 98-2; Doc # 98-3; Doc # 98-4; Doc # 98-5)

## II. ANALYSIS

### A. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of

summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the Court must view admissible evidence in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248. The nonmoving party's version of the facts must be relied upon unless blatantly contradicted by record evidence. *Scott v. Harris*, 550 U.S. 372, 378, 380-81 (2007).

**B. *Bivens* Claims**

The Court reviews *Bivens* claims under the same legal principles as Section 1983 actions, except for the requirement of federal action under *Bivens* and state action under Section 1983. *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015). "A plaintiff must prove two elements to prevail on either type of claim: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Id.* At this stage, the parties do not dispute that Defendants in this case acted under color of federal law. The issue here is whether Defendants deprived Jacobs of a right secured by the Constitution or laws of the United States.

### 1. Qualified Immunity

Each Defendant argues that he is entitled to qualified immunity on the constitutional claims against him. Jacobs responds that there are genuine issues of material facts to preclude summary judgment. Jacobs has also filed his own Motion for Summary Judgment arguing that he is entitled to judgment as a matter of law on various claims.

Government officials are entitled to qualified immunity where their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Green v. Reeves*, 80 F.3d 1101, 1104 (6th Cir. 1996) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A government official will not be immune if, on an objective basis, it is obvious that no reasonably

competent officer would have concluded that the action at issue was lawful; but if the officer of reasonable competence could disagree on this issue, immunity should be recognized. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is an initial threshold question the court is required to rule on early in the proceeding so that the costs and expenses of trial are avoided where the defense is dispositive. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*

The first inquiry to determine qualified immunity is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). If no constitutional right would have been violated, there is no necessity for further inquiries concerning qualified immunity. *Saucier*, 533 U.S. at 201. If a violation could be made out, the next step is to determine whether the right was clearly established in light of the specific context of the case, not as a broad general proposition. *Id.* Under the doctrine of qualified immunity, an official will not be found personally liable for money damages unless the official's actions violate "clearly established statutory or constitutional rights of which a reasonable person

would have known." *Harlow*, 457 U.S. at 818. The "clearly established" rights allegedly violated by the officials cannot be considered at an abstract level, but must be approached at a level of specificity: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "Reasonableness" is a question of law to be decided by the trial court.

### 2. Excessive Use of Force Claim Against Kimbrough and Alam

Where a plaintiff complains of excessive force in the course of an arrest, investigatory stop, or other seizure, the claim must be analyzed under the Fourth Amendment's objective reasonableness standard, not under a substantive due process standard. *Walton v. City of Southfield*, 995 F.2d 1311, 1342 (6th Cir. 1993) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The proper application of the objective reasonableness standard "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The Supreme Court has further explained:

> The calculus of reasonableness must embody allowance for the fact that
> police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97. The question for the Court is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This test "requires a 'careful balancing' of the individual interest in being free from unreasonable seizures and the important governmental interest in protecting the safety of its peace officers and the public." *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 396). "[L]aw enforcement officers may employ deadly force where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or to others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Pollard v. City of Columbus*, 780 F.3d 395, 403 (6th Cir. 2015).

Kimbrough argues that he is entitled to summary judgment on the excessive force claim because he used reasonable force in light of Jacobs' hostile demeanor, his pointing of his gun at Kimbrough, and his failure to put his weapon down on command. Alam argues that he entitled to qualified immunity on the excessive force claim because (1) Jacobs cannot demonstrate that Alam shot him, and (2) because, in the alternative, his actions were reasonable under the circumstances.

Viewing the facts in the light most favorable to Jacobs, the first *Graham* factor weighs in favor of Jacobs, as he was not committing any crime. The second *Graham*

factor also weighs in favor of Jacobs, as he was not a threat and testified that he never held, pointed, or fired his weapon.  At most, he startled the officers when he yelled and banged the kitchen door open.  According to Jacobs, having observed no signs that there were police officers at his house, he arrived home to find his basement residence had been ransacked.  He had a license to carry his weapon, and the weapon remained in its holster during the entire incident.  He was upset and yelling as he went up the stairs to investigate.  He forcefully opened the door at the top of the stairs, but he testified that he never entered the kitchen, reaching only the landing at the top of the stairs.  He saw Kimbrough and immediately turned around and fell down the stairs.  Jacobs never unholstered his weapon, and he maintains that he was shot by the officers from behind, as he was falling down the stairs attempting to retreat back to his basement residence.  No physical evidence indicating that Jacobs fired his gun was found at the scene.  Dotson and Vargas, Jr., the two lay witnesses at the scene, testified that they could not see Jacobs holding or firing the gun.  According to Jacobs, the single live round found on the kitchen floor was planted there later by an officer, as he never unholstered his weapon or racked it.  The third *Graham* factor also weighs in Jacobs's favor because he never resisted the officers.  According to Jacobs, he started retreating back into his basement unit, fell down the stairs, and then came back upstairs without his weapon with his hands up, as the officers ordered him to do.

The Court concludes that there remain genuine issues of material facts to preclude summary judgment in favor of Kimbrough or Alam. Taken in the light most favorable to Jacobs, a reasonable juror could conclude that Kimbrough and Alam violated Jacobs's constitutional right when they repeatedly fired at him as he was retreating back into the basement. Because our precedent clearly establishes a right not be shot unless perceived to pose a threat to officers or others, *see Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991), the Court denies Kimbrough's Motion for Summary Judgment on the excessive use of force claim, as well as deny Alam's Motion for Summary Judgment on the excessive use of force claim.

Turning to Jacobs's Motion, he argues that the Court should grant summary judgment in his favor on the excessive use of force claim because he posed no threat to the officers, and any perceived threat to the officers was a direct result of their failure to inform Jacobs of their presence. Jacobs further argues that he did not resist the officers, that his gun was in his holster, and that he fled the situation upon seeing Kimbrough. Jacobs argues that he had no reason to believe that the persons shouting commands at him were officers because there were no police vehicles outside, his residence had been ransacked, and the officers were not in uniform.

Viewing the evidence in the light most favorable to the nonmoving parties, Kimbrough and Alam, the first *Graham* factor weighs in favor of Defendants, as they testified that Jacobs was threatening a police officer at gunpoint—a serious

crime. The second *Graham* factor also weighs in favor of Defendants, as Jacobs posed an immediate and severe threat to the safety of the officers as well as the safety of Vargas, Jr. and Dotson. According to Kimbrough and Alam, Jacobs slammed the door open with his gun raised at eye level and pointed at Kimbrough. Kimbrough testified that Jacobs shot at him first, after he identified himself as a police officer and ordered him to put his weapon down. Alam testified that he shot his weapon fearing for his life and his partner's life after hearing several shots. Dotson testified that after she heard the bang of the door, the officers said, "Detroit Police," and she just started hearing gunshots coming from the kitchen. She testified that she heard the person who came up to the kitchen from the basement start automatically shooting. Forensic evidence indicated that the 9-millimeter live round found on the kitchen floor was chambered in and ejected from Jacobs's weapon. The third *Graham* factor also weighs in Defendants' favor because, according to them, Jacobs ignored police commands to drop his weapon.

The Court concludes that there remain genuine issues of material facts to preclude summary judgment in favor of Jacobs. Viewing the evidence in the light most favorable to Kimbrough and Alam, a reasonable jury could return a verdict in their favor. Accordingly, the Court denies Jacobs's Motion for Summary Judgment on the excessive use of force claim.

### 3. Failure to Protect Claim Against Alam, Weinman, and Knox

"[A] police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Generally, negligence is insufficient to hold a police officer liable for failure to prevent the use of excessive force; rather, the plaintiff must establish that the police officer was deliberately indifferent or reckless. *See Smoak v. Hall*, 460 F.3d 768, 785 (6th Cir. 2006). By definition, if there was no excessive force, then there can be no failure to intervene. *See Abdullahi v. City of Madison*, 423 F.3d 763, 767-68 (7th Cir. 2005). "[E]ach defendant's liability must be assessed individually based on his own actions." *Pollard*, 780 F.3d at 402 (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).

Weinman argues that he is entitled to qualified immunity on the failure to protect claim because he did not observe excessive use of force and had no reason to know it would be used, and because Jacobs cannot present any plausible scenario in which Weinman had a realistic opportunity to prevent any excessive force. Knox and Alam argue that they are entitled to qualified immunity on all claims, but do not make any arguments specifically related to the failure to protect claim.

With regards to Weinman, it is undisputed that he observed Jacobs approach the house; was informed by Vargas, Sr. that Jacobs lived in the basement; and alerted

the other officers that Jacobs lived in the basement and was possibly going to enter the house. It is undisputed that, at this point, Weinman had never entered the basement of the house. There is no evidence in the record that Weinman or any of the other officers were aware of a rear entry leading directly into the basement. Rather, Kimbrough went to the front door of the house to wait for Jacobs. It is undisputed that Weinman did not observe any excessive use of force, and under these facts, the Court finds that there is no question of material fact regarding whether Weinman had reason to know that excessive force would be or was being used. The Court concludes that Weinman is entitled to qualified immunity on the failure to protect claim.

With regards to Knox, there is no evidence that he saw Jacobs arrive at the house, or that he knew that Jacobs would possibly be entering the house. It is undisputed that Knox was sitting in his vehicle by himself when he heard gunshots which he eventually realized were coming from inside the house. Knox testified that the time between him hearing the gunshots and going inside the house was less than a minute, and that he made a quick pace to get back to the house. (Doc # 80-7, Pg ID 685) It is undisputed that by the time he entered the house, the shooting was over and Kimbrough was handcuffing Jacobs. *Id.* It is undisputed that Knox did not observe any excessive use of force, and under these facts, the Court finds that there is no material issue of fact that Knox had no reason to know that excessive force

21

would be or was being used. Nothing in the record indicates that Knox would have had the opportunity to prevent any harm from occurring. Knox is entitled to qualified immunity on the failure to protect claim.

With regards to Alam, even viewing the facts in the light most favorable to Jacobs, the Court finds that there is no material issue of fact that Alam did not have the opportunity to prevent harm from occurring. According to Jacobs, after arriving to his basement residence, Jacobs headed up the stairs yelling and forcefully opened the door. He saw Kimbrough and immediately turned around and fell down the stairs. Kimbrough immediately started shooting at him from behind as Jacobs fell down the stairs. It is undisputed that Kimbrough was much closer to Jacobs than Alam, and Jacobs testified that he did not even see Alam until after he came back upstairs with his hands up. It is undisputed that the events took place very quickly, and that the shooting was over within seconds. The Court concludes that Alam is entitled to qualified immunity on the failure to protect claim. *See Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (unpublished) ("[Plaintiff] presents no evidence showing that Mahoney knew or had reason to know of the impending excessive force or had the opportunity or means to intervene. Indeed, the span of time within which Mahoney should have perceived the excessive force and developed and implemented an intervention strategy could not have been more than

a few seconds. Mahoney had no opportunity to prevent the alleged use of force, given that the alleged events took place quickly and without any forewarning.").

Jacobs argues that the Court should grant summary judgment in his favor on the failure to protect claim because Weinman and Knox observed Jacobs entering the house, knew that he was unaware of the ongoing investigation, and could have but failed to alert Jacobs. For the same reasons discussed above, the Court denies Jacobs's Motion for Summary Judgment on the failure to protect claim.

### 4. Fabrication of Evidence Claim Against Kimbrough, Alam, Weinman, and Knox

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006). "[A] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Supurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999).

Alam argues that he is entitled to summary judgment on the fabrication of evidence claim because Jacobs lied at his deposition about the capacity of his handgun to support this frivolous claim. Alam further argues that there is no evidence that Alam intentionally misrepresented any material details in his police report. Kimbrough, Knox, and Weinman argue that they are entitled to qualified

immunity on all claims, but do not make any arguments specifically related to the fabrication of evidence claim.

Viewing the facts in the light most favorable to Jacobs, there remain genuine issues of material facts to preclude summary judgment in Defendants' favor. According to Jacobs, the single 9-millimeter live round found on the kitchen floor was planted there later by an officer, as he never unholstered his weapon or racked it during the incident. There were an unknown number of 9-millimeter rounds in the basement to which the officers had access while Jacobs waited outside to be transported by EMS to the hospital. It is undisputed that Weinman handled Jacobs's gun and 9-millimeter live rounds immediately following the shooting. According to Jacobs, Weinman planted a live 9-millimeter round on the kitchen floor to help corroborate his fellow officers' story, and Kimbrough testified falsely about seeing the live round during the shooting on the kitchen floor, in the area where Jacobs had been standing. According to Jacobs, Kimbrough and Alam falsely reported and falsely testified about Jacobs having his gun pointed at them, raised at eye level, and Kimbrough further falsely reported and falsely testified about Jacobs shooting at him.

The Court concludes that, there are material questions of fact regarding whether Kimbrough, Alam, and Weinman planted a live round which they ejected from Jacobs's Glock 9-millimeter handgun after Jacobs had been arrested. Under

Sixth Circuit precedent, it is clearly established that a person's rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury. *Supurlock*, 167 F.3d at 1006. The Court denies Kimbrough's, Alam's and Weinman's Motions for Summary Judgment on the fabrication of evidence claim.

Regarding Knox, the Court finds that Jacobs has produced no evidence that Knox fabricated evidence. Knox testified that he did not even participate in investigating the scene after the shooting. (Doc # 80-7, Pg ID 686) He only assisted with securing the perimeter outside the house. The Court grants Knox's Motion for Summary Judgment as to the fabrication of evidence claim.

Turning to Jacobs's Motion, he argues that the Court should grant summary judgment in his favor on the fabrication of evidence claim because: (1) the 9-milimeter live round found on the kitchen floor was not sent to the lab for forensic analysis; (2) it is absurd to think that Jacobs would have removed the clip from his gun while being shot at; (3) the maximum number of live rounds that Jacobs's gun could hold was ten, and Jacobs's gun had ten live rounds in it when Weinman cleared it after the shooting. Jacobs argues that the only possible explanation is that Defendants took a bullet from Jacobs's basement and placed it at the top of the stairs in a desperate attempt to frame him and corroborate their story that Jacobs shot at them. Jacobs further argues that Kimbrough and Alam made false statements in

police reports, specifically that Kimbrough falsely stated that Jacobs shot at him, and that Alam falsely stated that Jacobs had a gun in his hand.

Viewing the facts in the light most favorable to Defendants, according to Kimbrough and Alam, Jacobs slammed the door open with his gun raised at eye level and pointed at Kimbrough. Weinman testified that Jacobs could have easily and quickly racked his gun by simply pulling the slide back, which would have ejected any live round that was already in the chamber. There is no evidence that Jacobs would have had to remove the clip from his gun in order to rack it. According to the officers, Kimbrough saw the 9-millimeter live round on the kitchen floor during the shooting, and Weinman saw it immediately after the shooting, indicating that the officers did not plant it there. After the shooting, Gross recovered the 9-millimeter live round from the kitchen floor, and it was sent to a lab for forensic analysis and determined to have been chambered in Jacobs's Glock 9-millimeter handgun. At his deposition, Jacobs testified that the maximum number of live rounds that his gun could hold was ten, but according to the officers, Jacobs's gun recovered at the scene had a magazine that could hold seventeen rounds. Regarding the statements in the police reports, those statements conform to the officers' versions of the events, and whether the statements are false presents genuine issues of material facts. The Court concludes that viewing the evidence in the light most favorable to Defendants, a

reasonable jury could return a verdict in their favor. Accordingly, the Court denies Jacobs's Motion for Summary Judgment on the fabrication of evidence claim.

### 5. Conspiracy Claim Against Kimbrough, Alam, Weinman, and Knox

A civil conspiracy under *Bivens* is "an agreement between two or more persons to injure another by unlawful action." *Webb*, 789 F.3d at 670 (internal quotations and citations omitted). "A plaintiff must show that (1) a single plan existed; (2) defendants shared in the general conspiratorial objective to deprive the plaintiff of his constitutional rights; and (3) an overt act was committed in furtherance of the conspiracy that caused the plaintiff's injury." *Id.* (internal quotations and citations omitted). "[T]he overt-act element requires only that at least one of the alleged conspirators committed an overt act or omission in furtherance of the conspiracy." *Id.* at 671. "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient" to state a *Bivens* claim. *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). Circumstantial evidence may, however, provide adequate proof of conspiracy. *Webb*, 789 F.3d at 671.

Weinman and Alam argue that they are entitled to qualified immunity on the civil conspiracy claim because Jacobs has failed to allege his claim with sufficient specificity and has failed to support his claim with any evidence. Alam notes that his account of what occurred that night is slightly different from Kimbrough's

indicating that there was no conspiracy between them. Kimbrough and Knox argue that they are entitled to qualified immunity on all claims, but do not make any arguments specifically related to the civil conspiracy claim.

Jacobs responds that Defendants conspired in a single plan with the general conspiratorial objective of fabricating evidence in order to justify their unconscionable shooting of Jacobs. Jacobs argues that Kimbrough and Alam fabricated evidence by providing perjured testimony that Jacobs shot at them, that they identified themselves as police officers, and that the instructed Jacobs to drop his weapon. Jacobs further argues that Weinman planted the 9-millimeter live round on the kitchen floor. Jacobs does not move for summary judgment on this claim.

The Court finds that there are genuine issues of material facts, and under Jacobs's version of events, there would be circumstantial evidence that could enable a reasonable jury to infer the existence of a shared conspiratorial plan to frame Jacobs. Viewing the facts in the light most favorable to Jacobs, he was upset upon finding his apartment had been ransaked. He forcefully opened the door at the top of the basement stairs and saw a strange man. According to Jacobs, he immediately turned around to go back to the basement in fear and fell, never unholstering his weapon. He was then shot at from behind as he was falling down the stairs. The officers never identified themselves or gave him any commands until after the shooting was over. Jacobs maintains that, in order to cover up the circumstances of

this shooting, Kimbrough and Alam falsely arrested Jacobs. Kimbrough and Alam then falsely reported and falsely testified about Jacobs having his gun pointed at them, raised at eye level—something that only the two of them could testify to given that Vargas, Jr. and Dotson, the only other people in the house at the time, could not see Jacobs when he came up from the basement. According to Jacobs, Kimbrough further falsely reported and falsely testified about Jacobs shooting at him, a fact that no one else, not even Alam, could corroborate. According to Jacobs, Weinman planted a live 9-millimeter round on the kitchen floor to help corroborate his fellow officers' story, and Kimbrough testified falsely about seeing the live round during the shooting. The Court finds these alleged misdeeds are sufficiently intertwined so as to permit the inference of an agreement between the perpetrators to cover up their actions by framing Jacobs, followed by overt acts of false arrest, fabrication of evidence, false reporting, and false testimony. Those acts in turn caused Jacobs to be charged with eleven counts and to be incarcerated for 48 days.

The Court concludes that, taken in the light most favorable to Jacobs, there is at least a question of fact as to whether Kimbrough, Alam, and Weinman violated Jacobs's constitutional right by conspiring to cover up their actions and frame Jacobs, and then fabricating evidence and providing false reports and false testimony in furtherance of their conspiracy. Under Sixth Circuit precedent, it is clearly established that a person's rights are violated when evidence is knowingly fabricated

as discussed above, as well as when a person is falsely arrested as discussed below. The Court denies Kimbrough's, Alam's, and Weinman's Motions for Summary Judgment on the civil conspiracy claim.

It is unclear whether Jacobs asserts a civil conspiracy claim against Knox. To the extent that Jacobs relies exclusively on the aforementioned misdeeds of the Detroit Fugitive Apprehension Team, Jacobs was required to show that Knox shared a common plan to violate his constitutional rights. The Court finds that Jacobs has produced no evidence that Knox personally participated in framing him. The Court grants Knox's Motion for Summary Judgment as to any civil conspiracy claim against him.

### 6. False Arrest Claim Against Kimbrough and Alam

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). Where probable cause to arrest exists, no constitutional violation occurs, and the Court does not even reach the issue of qualified immunity. *Criss v. City of Kent*, 867 F.2d 259 (6th Cir. 1988). Probable cause to arrest has been defined as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person or one of reasonable caution, in believing in the circumstances shown that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S.

31, 37 (1979). Probable cause requires merely the probability of criminal activity, and need not show a "prima facie" case of the crime. *Illinois v. Gates*, 462 U.S. 213 (1983). Whether probable cause exists is determined by the totality of the circumstances. *Id.* at 238. A valid arrest based upon a then-existing probable cause is not vitiated if the suspect is later acquitted or the charges are dismissed. *Criss*, 867 F.2d at 262. An officer "is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Id.* at 263. "The Constitution does not guarantee that only the guilty will be arrested. If it did, Section 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released." *Id.*

Alam argues that he is entitled to summary judgment on the false arrest claim because his perception of events was supported by Abdella's testimony and Kimbrough's testimony at the preliminary examination. Alam further argues that there is no evidence that Alam provided knowingly false information in his report or in his testimony at the preliminary examination. Kimbrough argues that he is entitled to qualified immunity on all claims, but does not make any arguments specifically related to the false arrest claim.

Viewing the facts in the light most favorable to Jacobs, Jacobs testified that he never held, pointed, or fired his weapon. According to Jacobs, he was shot at by

Kimbrough and Alam from behind, as he was falling down the stairs attempting to retreat back into the basement unit. No physical evidence indicating that Jacobs fired his gun was found at the scene. Dotson and Vargas, Jr., the two lay witnesses at the scene, testified that they could not see Jacobs holding or firing the gun. According to Jacobs, the single live round found on the kitchen floor was planted there later by an officer, as he never unholstered his weapon or racked it. It is undisputed that immediately following the shooting, only Jacobs, Kimbrough, and Alam were inside the house. Kimbrough and Alam ordered Jacobs to place his weapon on the washer/dryer and to come upstairs with his hands up. Jacobs fully complied. Kimbrough and Alam then arrested Jacobs, and he did not resist. Jacobs was subsequently charged with four counts of Assault with Intent to Do Great Bodily Harm Less Than Murder, four counts of Assault with a Dangerous Weapon, two counts of Resisting and Obstructing a Police Officer, and one count of Felony Firearm. The 36th District Court found probable cause for Jacobs's arrest after hearing testimony from Kimbrough, Alam, Abdella, Vargas, Jr., and Dotson, but there is at least a question of fact as to whether Kimbrough and Alam provided false testimony at the preliminary examination as discussed above.

The Court finds that there remain issues of material fact as to whether Alam and Kimbrough had probable cause to arrest Jacobs for any of the aforementioned counts. Taken in the light most favorable to Jacobs, a reasonable juror could

conclude that Kimbrough and Alam violated Jacobs's constitutional right when they arrested him without probable cause. Because Sixth Circuit precedent clearly establishes a right not be arrested without probable cause, *see Criss*, 867 F.2d at 252, the Court denies Kimbrough's and Alam's Motions for Summary Judgment on the false arrest claim.

Turning to Jacobs's Motion, he argues that the Court should grant summary judgment in his favor on the false arrest claim because Kimbrough and Alam lacked probable cause and cannot rely on the results of the preliminary examination during which they knowingly provided false testimony. Jacobs asserts that "[t]he criminal investigation concluded that Plaintiff never shot at Defendants," and that the court relied on fabricated evidence to determine there was probable cause.

Viewing the facts in the light most favorable to Kimbrough and Alam, each one has been consistent in their police reports, preliminary examination testimony, trial testimony, and deposition testimony. Both maintain that they saw Jacobs pointing his gun at Kimbrough, and that Jacobs's gun was raised at eye level. Kimbrough maintains that Jacobs fired his gun at him. Under either account, Jacobs posed an immediate and severe threat to the safety of the officers as well as the safety of Vargas, Jr. and Dotson. According to Kimbrough and Alam, they identified themselves as Detroit Police and ordered Jacobs to put his gun down, but he did not comply. Abdella's testimony at the preliminary examination and criminal trial

supported Kimbrough and Alam's accounts. Abdella testified that, on the night of the shooting, Jacobs told him that that he could have shot the officer, that he had the jump on him, and that he had his gun right on the officer. After the shooting, Gross recovered a 9-millimeter live round from the kitchen floor, in the area where Jacobs had been standing, and forensic analysis determined that the live round had been chambered in Jacobs's gun. While it is undisputed that no physical evidence was found at the scene showing that Jacobs actually fired his weapon, there is at least a question of fact regarding whether Jacobs was pointing his gun, ready to fire. Contrary to Jacobs's assertion, the fact that no physical evidence was found at the scene showing that Jacobs actually fired his weapon does not definitively conclude that Jacobs never fired his weapon. Gross's report indicates that lighting at the scene was poor, and she might have not been able to locate all of the shell casings from the scene; genuine questions of material fact remain.

The Court finds that, under Kimbrough and Alam's version of events, they would have had probable cause to arrest Jacobs for Assault with Intent to Do Great Bodily Harm Less Than Murder, Assault with a Dangerous Weapon, Resisting and Obstructing a Police Officer, and Felony Firearm. The Court concludes that, viewing the evidence in the light most favorable to Kimbrough and Alam, a reasonable jury could return a verdict in their favor. Accordingly, the Court denies Jacobs's Motion for Summary Judgment on the false arrest claim.

### 7. Malicious Prosecution Claim Against Kimbrough, Alam, Weinman, and Knox

The Sixth Circuit recognizes a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which is entirely distinct from that of a false arrest claim, since a malicious prosecution claim remedies detention accompanied by wrongful institution of legal process. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). The plaintiff must show four elements to succeed on a malicious prosecution claim based on the Fourth Amendment: (1) that a criminal prosecution was initiated against the plaintiff, and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty, apart from the initial seizure; and (4) that the criminal proceeding was resolved in the plaintiff's favor. *Id.* Here, there is no dispute that Jacobs was deprived of his liberty as a result of criminal proceedings that were resolved in his favor. Accordingly, the Court focuses on the first and second elements.

Alam argues that there is no evidence that he provided knowingly false information at the preliminary examination, and that even excluding his testimony, there is no reason to believe that the court would not have reached the same conclusion. Weinman argues that he did not influence or participate in the decision to prosecute Jacobs because he was not personally involved in the shooting and did

not witness it, did not participate in the decision to arrest Jacobs, did not testify at his preliminary examination, and testified only briefly at the criminal trial. Weinman further argues that there was probable cause for the criminal prosecution. Kimbrough and Knox argue that they are entitled to qualified immunity on all claims, but do not make any arguments specifically related to the malicious prosecution claim.

Regarding the first element, "[t]o be liable for participating in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Webb*, 789 F.3d at 660 (internal quotations omitted). Jacobs provides no evidence or argument that the prosecutor or state court relied on any report or testimony from Knox. Accordingly, the Court grants Knox's Motion for Summary Judgment on the malicious prosecution claim.

As to Weinman, he did not testify at the preliminary examination. During the criminal trial, his brief testimony was mostly limited to how he cleared Jacobs's gun for officer safety after the shooting, and an explanation of what racking a gun entails. Weinman had no knowledge and made no report of any assault or officer resistance on the part of Jacobs. As with Knox, Jacobs has not shown that any report or testimony from Weinman affected the court's finding of probable cause to prosecute or the prosecutor's decision to charge and prosecute Jacobs for Assault with Intent to Do Great Bodily Harm Less Than Murder, Assault with a Dangerous Weapon,

Resisting and Obstructing a Police Officer, and/or Felony Firearm. Accordingly, the Court grants Weinman's Motion for Summary Judgment on the malicious prosecution claim.

Kimbrough and Alam, on the other hand, as the only ones who actually saw Jacobs allegedly pointing and/or shooting a gun at the officers, wrote detailed reports and provided extensive testimony at both the preliminary examination and trial. The Court finds for purposes of this motion that Kimbrough and Alam influenced the decision to prosecute Jacobs.

Regarding the second element, "probable cause to initiate a criminal prosecution exists where facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Id.* (internal quotations omitted). The 36th District Court found probable cause for Jacobs's prosecution after hearing testimony from Kimbrough, Alam, Abdella, Vargas, Jr., and Dotson. It is undisputed that Abdella was not at the scene during the shooting, and that Vargas, Jr. and Dotson testified that they could not see Jacobs and did not see him pointing or holding a gun. Again, Kimbrough and Alam were the only witness who actually saw Jacobs allegedly pointing and/or shooting a gun at the officers. Jacobs alleges that Kimbrough and Alam knowingly or recklessly presented false testimony at the preliminary examination on this point. As discussed above, drawing factual inferences in Jacobs's favor, Kimbrough's testimony and

Alam's testimony at the preliminary examination contained knowing or reckless falsehoods. The Court findd that there remain genuine issues of material facts as to this element to preclude summary judgment in favor of Kimbrough or Alam. Because our precedent clearly establishes a right to be free from malicious prosecution based on false testimony, *see id.* at 659, 665-66; *Sykes*, 625 F.3d at 308, the Court denies Kimbrough's and Alam's Motions for Summary Judgment on the malicious prosecution claim.

Turning to Jacobs's Motion, he argues that the Court should grant summary judgment in his favor on the malicious prosecution claim because Kimbrough and Alam influenced and participated in the decision to prosecute Jacobs by providing false testimony at the preliminary examination. Jacobs further argues that there was no probable cause for his criminal prosecution because "the investigation conducted by the crime scene investigators unequivocally determined that Plaintiff never fired a single shot" and because Kimbrough and Alam knowingly presented false testimony at the preliminary examination.

Viewing the facts in the light most favorable to Defendants, Jacobs cannot establish the second element of his malicious prosecution claim at this stage. As discussed above under the false arrest claim discussion, the Court finds that, under Kimbrough and Alam's version of events, there was probable cause to prosecute Jacobs for each of the charges. The Court concludes that, viewing the evidence in

the light most favorable to Kimbrough and Alam, a reasonable jury could return a verdict in their favor. Accordingly, the Court denies Jacobs's Motion for Summary Judgment on the malicious prosecution claim.

> **8. Substantive Due Process Violation of Right to Liberty Claim Against Kimbrough and Alam**

Jacobs argues that the officers used unnecessary force when they shot him, and that their conduct, in shooting a civilian who posed no threat with the intention to kill him, shocks the conscience. Defendants do not address this substantive due process claim.

As noted above, where a plaintiff complains of excessive force in the course of an arrest, investigatory stop, or other seizure, the claim must be analyzed under the Fourth Amendment's objective reasonableness standard, not under a substantive due process standard. *Walton*, 995 F.2d at 1342 (citing *Graham*, 490 U.S. at 395). Accordingly, the Court grants Defendants' Motions for Summary Judgment on any due process claim and denies Jacobs's Motion for Summary Judgment on any substantive due process claim.

## IV. CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendants Damon Kimbrough and Michael Knox's Motion for Summary Judgment (Doc # 80) is GRANTED IN PART as to the substantive due process claim against Kimbrough, and as to all claims against

Knox, and DENIED IN PART as to the excessive force, fabrication of evidence, civil conspiracy, false arrest, and malicious prosecution claims against Kimbrough.

IT IS FURTHER ORDERED that Defendant Michael Knox is DISMISSED from this action.

IT IS FURTHER ORDERED that Defendant David Weinman's Motion for Summary Judgment (Doc # 83) is GRANTED IN PART as to the failure to protect and malicious prosecution claims, and DENIED IN PART as to the fabrication of evidence and civil conspiracy claims.

IT IS FURTHER ORDERED that Plaintiff Eduardo Jacobs's Motion for Summary Judgment (Doc # 84) is DENIED.

IT IS FURTHER ORDERED that Defendant Ramon Alam's Motion for Summary Judgment (Doc # 86) is GRANTED IN PART as to the failure to protect and substantive due process claims, and DENIED IN PART as to the excessive force, fabrication of evidence, civil conspiracy, false arrest, and malicious prosecution claims.

Dated:  August 23, 2017                          s/Denise Page Hood
                                                 Chief, U.S. District Court

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 23, 2017, by electronic and/or ordinary mail.

s/Julie Owens
Acting in the absence of  LaShawn R. Saulsberry
Case Manager